**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

United States of America,                                        Case No. 3:12CR6

          Plaintiff

     v.                                                                  **ORDER**

Hani Younis,

          Defendant

This is a criminal case in which the defendant, Hani Younis, an immigrant from Palestine, is charged with trafficking in contraband cigarettes in violation of 18 U.S.C. § 2342(a). The indictment resulted from a traffic stop during which Ohio State Highway Patrol (OSHP) Trooper Kurt Beidelschies discovered boxes of cigarettes in the cargo compartment of a U-Haul truck which the defendant was driving.

Pending is the defendant's motion to suppress the evidence seized during the stop and the defendant's subsequent statements. (Doc. 8). For the reasons that follow, I grant the motion in part and will schedule further briefing as to the remaining issues.

**Background**

Shortly before 2:00 p.m. on December 20, 2012, Trooper Beidelschies was parked in a crossover facing southbound at milepost 53 on Interstate 80. He was observing eastbound traffic when he saw the defendant's U-Haul pass by at about fifty-five miles per hour. The defendant, according to the trooper, was sitting rigidly upright, holding the steering wheel at the "10-2" position. He decided to follow the defendant. He based his decision on certain "indicators:" the

vehicle was a rental truck, the defendant's rigid position was "odd," as was his manner of holding the steering wheel, and he was driving about fifteen miles below the posted limit.

According to the trooper, he saw the defendant's truck cross over the "fog line" (the white stripe on the right-hand side of the roadway. Such failure to remain within a lane of travel constitutes a violation of O.R.C. § 4511.33. The trooper pulled into the lefthand lane and alongside the truck. From that vantage point, he testified, he concluded, based on the defendant's position in the lane, that the defendant again crossed over the fog lane. He pulled back behind the truck and observed another crossing of the fog line.[1]

The trooper stopped the truck. Before doing so, the record function on the cruiser's video camera was activated when the trooper turned on his light bar to signal the defendant to stop. Though the camera recorded the stop and subsequent events, it did not record any of the crossings over the fog lane.[2]

Trooper Beidelschies approached the truck on the passenger side. The defendant, whose arm was in a cast, was the driver. His wife, Rania, was by the passenger side door and their young daughter was in the middle.

---

[1] Trooper Beidelschies testified that his practice is frequently to follow rental trucks (which are often used to transport contraband) and stop them if he observes more than one traffic violation. He also testified that the truck went far enough to the right to cross the rumble strips parallel to the fog line. Mrs. Younis testified that the vehicle did not go on the rumble strips.

[2] The camera is on continuously, but only records when that function is either turned on manually or when the trooper activates the cruiser's light bar or siren. When activated, the record function retrieves the preceding sixty seconds and records until turned off.

The device can record up to six hours. Before recording this stop, the trooper had not recorded anything else during his shift, which began six hours earlier, at 8:00 a.m.

On being asked for his driver's license, the defendant raised his hand and said, in English, he was having hard time driving because his hand was in a cast. Mrs. Younis interjected, telling the trooper that the defendant did not speak English very well.[3]

Mrs. Younis, who had rented the truck, produced an Illinois driver's license. The defendant did not have a license. In response to the trooper's standard questions about their origin and destination of and purpose for their journey, Mrs. Younis said they were moving a friend's furniture from Chicago to New York. She could not give an exact destination, but said they were to call before arriving.

The trooper believed that the fact that someone other than the driver had rented the truck, the stated nature of the trip, and the amount Mrs. Younis had paid in cash to rent the truck were unusual, and possibly further "indicators." Consequently, he asked, "[D]o you mind showing me the furniture?" (Tr. 33).

Mrs. Younis said, "Yeah," and then had a conversation with the defendant in Arabic. The trooper than asked who was going to exit the vehicle, and the defendant said, "I am." (*Id.* 34). He then got out of the truck and walked around to the back. The trooper "asked him to voluntarily open the back of the U-Haul to verify what they were hauling was actually furniture." (*Id.* 35). The defendant opened the back of the U-Haul, and, in response to the trooper's question about how he had broken his hand, said, in English, that he had done so while loading boxes.

Instead of furniture, the cargo area had nothing but cardboard boxes. Trooper Beidelschies told the defendant he didn't believe that that was furniture. Whereon, the defendant "shrugged his

---

[3] Mrs. Younis later testified that, on a scale of zero to ten, the defendant's English speaking ability is a one. While he can read simple signs, he would be unable to read a newspaper.

3

shoulders and kind of shook his head yes, it didn't appear to be furniture." (*Id.* 36). The trooper asked the defendant if he "minded opening one of the boxes." The defendant "shrugged his shoulders and said 'Sure.'" (*Id.*). The defendant opened a box. Inside were two cartons of cigarettes, which fit snugly in the outer box.

Trooper Beidelschies placed the defendant in his cruiser, and then did likewise with Mrs. Younis and the child. Before putting the defendant in the cruiser, Trooper Beidelschies recited the Miranda warnings to the defendant. In response to the advisement, the defendant "kind of just put his hands up." (*Id*. 41).

The trooper did not interrogate the defendant, aside from asking routine biographical questions.

In the meantime, other troopers had arrived. With Trooper Beidelschies and his passengers following behind, another trooper drove the truck to a nearby patrol post. Trooper Beidelschies's video camera continued to record the truck until it reached the next crossover (at milepost 59).

Along the way, the defendant "asked if he was going to jail, and then he asked what was in the back of the U-Haul." (*Id*. 46). The trooper said "cigarettes," and the defendant replied, "cigarettes." (*Id*. 49).

On arriving at the post, Mrs. Younis was placed in an interrogation room; the defendant was kept in a break room adjacent to the garage. Prior to their arrival, OSHP Investigator James Stanbaugh and ATF Agent Ward had arrived at the post.

4

Trooper Stanbaugh first interrogated Mrs. Younis. He did not record his interrogation.[4] Prior to the interrogation Agent Ward had read her the Miranda warnings. Before doing so, Agent Ward had confirmed that Mrs. Younis spoke English.

After concluding his interrogation of Mrs. Younis, Trooper Stanbaugh went down to question the defendant. On being asked if he needed someone to translate, the defendant said he wanted his wife with him. Trooper Stanbaugh indicated the defendant's English "was pretty limited. Pretty simple English." (*Id.* 94). During the ensuing interrogation, the defendant would respond to some questions in English and others in Arabic, which Mrs. Younis would translate.

Mrs. Younis had translated the Miranda warnings and form for the defendant. He signed the form. Before doing so, he had said he could not afford a lawyer. The trooper repeated the advice about appointment of counsel without cost. Thereon, the defendant stated "he wanted to explain . . . what had happened, and that he didn't need an attorney." (*Id*. 97).

At the end of the interrogation, Mrs. Younis and the child were released and the defendant was remanded to custody.

### Discussion

### 1. Stop and Ensuing Seizure

With regard to the lawfulness of the stop, I am not persuaded that it is more likely than not that Trooper Beidelschies saw lane change violations.

---

[4] Trooper Stanbaugh stated that it was not his practice to record his interrogations. He said he can remember well enough without recording. He acknowledged that other OSHP investigators record their interrogations.

5

I do not credit his testimony about seeing three crossings over the fog line. While he acknowledged that the truck would have gone onto the rumble strips, Mrs. Younis testified – and I credit her testimony – that the truck did not go on the strips.

As I noted in my comments at the conclusion of the evidentiary hearing, the failure, which I deem deliberate, not to activate the record function manually greatly affects my view of the trooper's credibility. Particularly given the fact that recording continued for several minutes as another trooper was driving the truck to the post, the failure to record from the outset, or, at the latest on observing the first lane violation, is inexplicable.

There was ample recording capacity in the unit – indeed, none of the six hours' capacity had been used during the trooper's first six hours on duty. The failure to turn on the recording function when there was no reason not to do so substantially undercuts the credibility of the trooper's testimony.

Unless recorded, allegations of repeated lane violations, especially within a relatively short distance, as the trooper claimed he saw happen, strain credulity. Like the notorious "dropsy" cases of yore,[5] there is something inherently implausible in this sort of contention.

_____

[5] "There are studies and commentary to the effect that the exclusionary rule tends to lessen the accuracy of the evidence presented in court because it encourages the police to lie in order to avoid suppression of evidence." *U.S. v. Janis,* 428 U.S. 433, 447 (1976) (citing, *e.g.,* Comment, *Police Perjury in Narcotics "Dropsy" Cases: A New Credibility Gap*, 60 Geo.L.J. 507 (1971)). Moreover, as Justice Thurgood Marshall noted in *Briscoe v. LaHue,* 460 U.S. 325, 365 (1985) (citations omitted) (Marshall, J., dissenting in part):

> Police officers and other government officials differ significantly from private citizens, around whom common-law doctrines of witness immunity developed. A police officer comes to the witness stand clothed with the authority of the state. His official status gives him credibility and creates a far greater potential for harm than exists when the average citizen testifies. . . . At the same time, the threat of a criminal perjury prosecution, which serves as an important constraint on the average witness'

6

This is especially so under the facts of this case: according to Trooper Beidelschies, the defendant maintained a rigid posture, with his hands at the "10-2" position. Both of those circumstances make it less, rather than more, likely that the defendant drifted not once but *three* times off to the right hand side of the roadway. Added to his mode of handling the steering wheel was the fact that he was going at a relatively slow – but entirely lawful – speed. Under these circumstances, the likelihood that he would not maintain careful and proper control over the vehicle is, in my view, quite slight.

I find, accordingly, that the initial stop was unlawful. This necessarily invalidates the ensuing search of the cargo compartment under the poisoned tree doctrine. *See U.S. v. Delano*, 543 F. Supp. 2d 791, 803 (N.D. Ohio 2008) (citing *Wong Sun v. U.S.*, 371 U.S. 471, 487–88 (1963)).

In any event, I find that the defendant's willingness to open the vehicle manifested a submission to authority, rather than voluntary consent. "The Fourth Amendment test for a valid consent to search is that the consent be voluntary, and '[v]oluntariness is a question of fact to be determined from all the circumstances[.]'" *Ohio v. Robinette*, 519 U.S. 33, 40 (1996) (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 248-49 (1973)). Although not determinative, "the subject's knowledge of a right to refuse is a factor to be taken into account[.]"*Bustamonte*, 412 U.S. at 249.

---

testimony, is virtually non-existent in the police-witness context.

This being so, it is especially important that courts not be too quick to credit testimony, especially testimony tinged with implausibility that is difficult to refute, and cannot – *unless the officer has recorded his or her actions* – be corroborated.

The defendant is a foreign national with limited ability to understand and speak English. In all likelihood he, unlike native born citizens. probably had no culturally acquired or even subliminal understanding of his Fourth Amendment rights. On being stopped, he was simply asked, in English, if the trooper could see the furniture. To which his wife responded, "Yeah." This was followed by some conversation in Arabic between the defendant and his wife. The trooper then asked who would be getting out of the truck. The defendant said, "I am" and went to the back of the truck and opened the door.

The trooper testified that he "asked him to voluntarily open the back of the U-Haul to verify what they were hauling was actually furniture." (Tr. at 35). But I doubt that, to the extent he asked the defendant to open the cargo area, he did so in a way that communicated the need for him to do so voluntarily.

I find the defendant's actions manifested submission to the trooper's authority rather than the requisite knowing, intelligent, and voluntary assent which the Fourth Amendment requires.

## 2. Statements

As I understand the record, Trooper Beidelschies did not engage in "interrogation" while the defendant and his family were in the cruiser. Routine biographical questions are not interrogative. *U.S. v. Avery*, 717 F.2d 1020, 1025 (6th Cir.1983).

Had interrogation occurred, I would hold that any ensuing statements were fruit of the poisonous tree, and that the trooper's roadside Miranda warnings did not attenuate the taint. In contrast to the pre-questioning process which Trooper Stanbaugh and Agent Ward employed at the patrol post, the roadside rote recitation simply could not have served to inform *this* defendant that he could remain silent and have a lawyer with him before any questioning began.

This does not answer all questions as to the defendant's statements, both in the cruiser and at the post.

First, with regard to his statements in the cruiser, the parties should address whether they were volunteered or instead the product of inherently coercive circumstances, so that they could not be deemed to be voluntary.

Second, with regard to any in-cruiser statements between the defendant and his wife which may have been recorded and which the government wants to offer as evidence, the parties should address whether statements made otherwise absent a reasonable expectation of privacy are inadmissible due to the unlawfulness of the speakers' being where they could be recorded – *i.e.*,, in custody that should not have occurred.

Third, with regard to the statements during the station house interrogation, the parties should address whether the warnings given to the defendant sufficed to attenuate the taint of the original stop and search and seizure of the truck and its contents.[6]

---

[6] As I also expressed at the conclusion of the hearing, I am deeply concerned about the failure of Trooper Stanbaugh to record his interrogation. I neither know of nor can perceive any valid reason for any law enforcement agency or officer, where the means to do so are readily at hand, not to record his or her activities, whether during a traffic stop or in an interrogation room. Officers sworn to uphold not just the laws, but also the Constitutions of the United States and the State of Ohio have the most important of all motives – fidelity to that oath –for recording such encounters.

9

**Conclusion**

For the reasons stated, I find that the stop and search and seizure of the truck and its contents violated the Fourth Amendment.

Further issues needing briefing, it is hereby

ORDERED THAT the clerk shall set this case for a status/scheduling conference.

So ordered.


/s/ James G. Carr
Sr. United States District Judge

10